# Exhibit 1

Misc. Case No. 05-mc-0514-PLF
Misc. Case No. 06-mc-0281-RMC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

JUL 2 4 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| ROTHE DEVELOPMENT CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )    Civil Action No: SA-98-CA-1011-XR |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF DEFENSE and THE UNITED | ) |
| STATES AIR FORCE, | ) |
| | ) |
| Defendants. | ) |

## ORDER

On this day came on to be considered the following: Rothe's motion for clarification (docket no. 261); Defendants' motion for protective order (docket no. 273); Rothe's motion to compel (docket no. 277); Rothe's motion for reconsideration (docket no. 280); DOJ's motion for protective order (docket no. 281); and Defendants' motion for reconsideration (docket no. 282).

## Background

At issue is the constitutionality of Section 1207 of the National Defense Authorization Act of 1987 (the "Act"). In the Act, Congress set a goal that five percent of the total dollar amount of defense contracts for each fiscal year would be awarded to small businesses, owned and controlled by socially and economically disadvantaged individuals (SDBs). 10 U.S.C. § 2323. In order to achieve that goal, Congress authorized the Department of Defense to adjust bids submitted by non-socially and economically disadvantaged firms upwards by ten percent (the "price evaluation adjustment program" or "PEA"). 10 U.S.C. § 2323(e)(3).

1

In 1998, Plaintiff Rothe Development Corporation ("Rothe")[1] was technically the lowest

bidder on a defense contract, its bid was adjusted upward by ten percent, and a third party, who

qualified as a socially and economically disadvantaged business, became the "lowest" bidder.

Rothe complains that both the five percent goal and the ten percent preferential increase violate the

Equal Protection guarantee of the Fifth Amendment because both rely in part on race-conscious

classifications. In 2005, this court heard for the first time that Rothe also objects to the following

elements of the § 1207 program[2]: (1) subcontracting incentive programs[3]; (2) "awards using less

than full and open competition/set asides to the designated groups of 10 U.S.C. § 2323(a) with no

competition, to include 'awards under section 8(a) of the Small Business Act'"; (3) advance

payments[4]; (4) assistance as provided in 10 U.S.C. § 2323(c)[5]; and (5) the provision of SDB status

---

[1] The Rothe Companies advertise themselves as a Women Owned Small Business, a Women Owned HUBZone Small Business, and a Veteran Owned Small Business. They bring no challenge to any preferences awarded by the government based on these classifications.

[2] The PEA has been suspended since 1998 because DoD has met its 5 percent goal for contract awards to SDBs.

[3] Section 2323 (e)(5) states, in part, as follows: "Each head of an agency shall prescribe regulations which provide for the following: (A) Procedures or guidance for contracting officers to provide incentives for prime contractors referred to in subsection(a)(3) to increase subcontractor awards to entities described in subsection (a)(1)." *See also* §§ (a)(3) & (h)(2).

[4] Section 2323(e)(2) states: "To the extent practicable and when necessary to facilitate achievement of the 5 percent goal described in subsection (a), the head of an agency shall make advance payments under section 2307 of this title to contractors described in subsection (a). The Federal Acquisition Regulation shall provide guidance to contracting officers for making advance payments to entities described in subsection (a)(1) under such section."

[5] Section 2323(c) provides that to attain a goal of 5 percent of funds obligated for DoD contracts be awarded to socially and economically disadvantaged individuals, agency heads "shall provide technical assistance" to such individuals. "Technical assistance provided under this section shall include information about the program, advice about agency procurement procedures, instruction in preparation of proposals, and other such assistance as the head of the agency considers

2

to historically black colleges and universities. In an effort to fully address all issues in this case, the Court liberally reads Plaintiff's live Complaint to assert a challenge to section 2323, but does not read the complaint to challenge any other statutes besides section 2323 (specifically this court does not entertain in this case any challenge to section 8(a) of the SBA, 15 U.S.C. §§ 637, et seq.). *See* Docket nos. 195, 199, and 218.

### Rothe I

This case has a long history. In 1999, this Court held: (1) Congress had a compelling purpose in establishing DoD contract preferences for disadvantaged businesses; (2) a Department of Commerce's benchmark study, which was used by the government as a source of statistics supporting an inference of discrimination, was sufficient to meet the government's burden of production; and (3) the Section 1207 program at issue was narrowly tailored to satisfy the compelling government interest. *Rothe I*, 49 F. Supp.2d 937 (W.D. Tex. 1999)(J. Prado). An appeal was taken to the Fifth Circuit, but because a Tucker Act claim was present, the Fifth Circuit concluded it had no jurisdiction (*Rothe II*, 194 F.3d 622 (5th Cir. 1999)) and an appeal was filed with the Federal Circuit. The Federal Circuit vacated and remanded. *Rothe III*, 262 F.3d 1306 (Fed. Cir. 2001).

### Rothe III

In vacating and remanding, the Federal Circuit opined on differing topics that are relevant to this Order.

The Federal Circuit concluded that this court correctly allocated the burden of proof on Rothe to demonstrate that the program was unconstitutional. "Before a court can assess whether a plaintiff has met his or her burden of proof, however, the court must review the government's evidentiary

---

appropriate."

3

support to determine whether the legislative body had a 'strong basis in evidence' to believe that remedial action based on race was necessary. Thus, the government bears the burden to produce evidence, i.e., the burden of going forward with evidence. The challengers, however, 'continue to bear the ultimate burden of persuading the court that the [entity's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently narrowly tailored.'" *Rothe III*, 262 F.3d 1306, 1317 (Fed. Cir. 2001)(citations omitted).

Secondly, the Federal Circuit concluded that this court improperly applied a deferential standard, rather than strict scrutiny, in reviewing this equal protection challenge. In this regard the Federal Circuit stated: "Although acknowledging that strict scrutiny must be applied in reviewing a federal racial classification, the district court in this case opined that Congress, unlike states or municipalities, should be given deference both 'in articulating a compelling purpose ··· [and in showing] that its action is narrowly tailored to that purpose.'" Rejecting the district court's analysis, the Federal Circuit held that the "1207 program was enacted pursuant to Article I, and so, as set forth in *Adarand III*, Congress is entitled to no deference in determining whether Congress had a compelling interest in enacting the racial classification, and that the classification was narrowly tailored in fulfillment of that interest. On remand, thus, the district court should undertake the same type of detailed, skeptical, non-deferential analysis undertaken by the *Croson* Court, but specifically account for the factual differences between this program and that at issue in *Croson*. Adopting the strict scrutiny analysis to the specific facts at issue in a case, however, must not result in a lesser degree of scrutiny than was required by the Court in *Croson*. Strict scrutiny is a single standard and must be followed here." *Rothe III*, 262 F.3d at 1321.

4

Third, although "Congress is entitled to no deference in its ultimate conclusion that race-based relief is necessary does not mean that Congress is entitled to no deference in its factfinding." *Rothe III*, 262 F.3d at 1322, fn. 14.

Fourth, "Congress ha[s] a 'broader brush' than municipalities for remedying discrimination. Whereas municipalities must necessarily identify discrimination in the immediate locality to justify a race-based program, ... Congress [does not need] to have had evidence before it of discrimination in all fifty states in order to justify the 1207 program. Contrarily, evidence of a few isolated instances of discrimination would be insufficient to uphold the nationwide program." *Rothe III*, 262 F.3d at 1329.

Fifth, in analyzing the evidence before Congress at the time of the reauthorization of the 1207 program, this court cannot rely on post-reauthorization evidence.

As to pre-authorization evidence, "[u]nder *Croson*, in order to determine whether a racial classification is constitutional, a reviewing court must be satisfied that a 'strong basis in evidence' supports the legislature's conclusion that discrimination persisted and remedial action was needed.... [It] is essential that the district court set forth detailed findings as to the scope and content of the reports before Congress when it enacted the challenged legislation, and set forth whatever inferences may be drawn as to whether such reports could constitute a 'strong basis in evidence' for remedial action." *Rothe III*, 262 F.3d at 1322-23.

Six, "in assessing the constitutionality of a statute in an equal protection context, a reviewing court should be able to consider all evidence available to Congress pre-dating the most recent reauthorization of the statute at issue." *Rothe III*, 262 F.3d at 1322, fn. 15.

Seven, "the mere listing of pre-reauthorization references by the district court fails ... to

5

provide adequate findings on which to conclude that Congress had a 'strong basis in evidence' for reauthorizing the 1207 program. Under *Croson*, a race-based classification may be enacted to remedy only identified systematic discrimination. Accordingly, generalized assertions of legislative purpose or statements generally alleging societal discrimination or an individual's anecdotal accounts of discriminatory conduct would have little or no probative value in supporting enactment of a race-conscious measure." *Rothe III*, 262 F.3d at 1323.

Eight, "[s]tatistical evidence is particularly important to justify race-based legislation." *Rothe III*, 262 F.3d at 1323-24 ("The only pre-reauthorization statistical evidence cited by the district court is a statement in a 1975 House report that 'only three percent of American businesses were owned by minorities, while minorities made up sixteen percent of [the] population.' H.R. Rep. No. 468, 94th Cong., 1st Sess. 2 (1975), cited in *Rothe I*, 49 F. Supp.2d at 946. We conclude that this statistic itself is insufficient to support the constitutionality of the 1207 program as reauthorized. This report provides no data on how many minorities sought to own small businesses, nor does it take into account the particular industry of the contract at issue, let alone how many minority-owned small businesses in this industry were qualified, willing, and able to compete for DOD contracts, like the one at issue here. Further, the statistic does not take into account the fact that the sheer number of businesses owned by minorities may not be significantly correlated with the volume of business conducted by minority-owned businesses. Moreover, the statistic may be outdated, as it was already twelve years old at the time Congress initially enacted the 1207 program, and seventeen years old at the time of reauthorization.").

Further, the Federal Circuit directed this court to "determine whether the evidence before it is sufficiently timely and sufficiently substantive (i.e., not merely anecdotal) to properly support the

6

program's constitutionality." The Federal Circuit noted "that much of the evidence referenced by the district court was more than a decade old by the time of the 1207 program's reauthorization in 1992." *Rothe III*, 262 F.3d at 1330.

In addition, the Federal Circuit directed this court to "reassess whether the 1207 program is narrowly tailored, both as reauthorized and as applied, under a non-deferential version of strict scrutiny." *Rothe III*, 262 F.3d at 1331 ("On remand, the district court should conduct a probing analysis of the efficacy of race-neutral alternatives, for instance, by inquiring into any attempts at the application or success of race-neutral alternatives prior to the reauthorization of the 1207 program.").

### Rothe IV

Attempting to comply with the remand instructions, this court again reviewed the evidence presented by the parties and concluded that the Government failed to demonstrate that Congress had a strong basis to believe that a race-based remedial program was necessary in 1992. 324 F. Supp.2d 840, 850 (W.D. Tex. 2004)(J. Rodriguez). This court held that the program, as reauthorized in 1992 and applied in 1998, was unconstitutional. However, with regard to Rothe's facial challenge of the program as reauthorized in 2002, this court concluded that the statistical evidence before Congress at that time, coupled with Congress' long documentary history of anecdotal and private discrimination, met the strong basis in the evidence test.

### Rothe V

No appeal was taken of this court's ruling that the program, as reauthorized in 1992 and applied in 1998, was unconstitutional. On appeal, Rothe argued that this court's findings and legal analysis did not support a holding that the 2002 reauthorization of section 1207 was facially constitutional. The government sought a remand to develop the record so that legally sufficient

findings could be made.[6] Of interest to the numerous discovery disputes that this court must now address, it is interesting to point out that the Federal Circuit stated: "We note that our holding requires only that an opportunity to take discovery on the facial unconstitutionality of the present reauthorization of section 1207 be provided but does not dictate that any specific discovery be allowed or prohibited, including the discovery addressed in the district court's January 27, June 10, and September 26, 2003, orders." *Rothe V*, 413 F.3d 1327, 1337 fn. 4 (Fed. Cir. 2005).

In addition, the Federal Circuit provided directives that this court must make "a finding that [any] studies were put before Congress prior to the date of the present reauthorization in relation to section 1207 and to ground its enactment." *Rothe V*, 413 F.3d at 1338. Also, the Federal Circuit stated that any "reliance on Congress's institutional memory ... is insufficient to reject ... [a] staleness argument. Because staleness relates to whether the data itself is "outdated," the focus must be on the data, not on whether Congress was aware of the data. Thus, the district court should consider on remand whether the data presented is so outdated that it does not provide a strong basis in evidence for the most recent reauthorization of section 1207." *Rothe V*, 413 F.3d at 1338.

### 2006 Reauthorization

On January 6, 2006, Congress again reauthorized the section 1207 program. *See* 2006 National Defense Authorization Act, Pub. L. 109-163. Accordingly, this court directed the parties to present what, if any, evidence was before Congress at the time of this 2006 reauthorization.

### Order of September 21, 2005 (docket no. 199)

---

[6]Defendants argued that certain discovery orders led them to believe that this court narrowed the issues to exclude the evaluation of the 2002 reauthorization. That was never the intent of this court. This court directed the parties to comply with all aspects of the Federal Circuit remand, and no party ever sought any clarification of the discovery orders.

In this Order the court set forth various discovery rulings. The Court allowed Rothe to send duces tecum requests for production of documents to representatives of the Commerce Department, Justice Department, Defense Department and the SBA for the limited purpose of discovering what, if any, documents these agencies sent to Congress as part of the 2002 and 2006 reauthorization processes. Further, the Court allowed Rothe to seek discovery as to whether any of the documents sent contained stale data. The Court also allowed Rothe to re-depose a representative of the Urban Institute regarding its report titled "Do Minority-Owned Business Get a Fair Share of Government Contracts?" The Court also allowed Rothe to seek discovery from the Urban Institute as to what, if any, documents it sent to Congress as part of the 2002 and 2006 reauthorization process. Further, the Court allowed Rothe to seek discovery as to whether any of the documents sent contained stale data. *See also* Order filed Nov. 10, 2005, docket no. 218.

### Rothe's motion for clarification (docket no. 261)

In this motion Rothe seeks clarification as to whether it can conduct certain additional discovery[7]. Rothe states that the "issues are in summary: 1) whether Congress considered through studied analysis the Urban Institute Report; 2) whether any hearings were held by Congress directly related to gathering evidence to justify reauthorization of Section 1207 in 2002 and 2006 and the content of those hearings; and 3) whether the Appendix is relevant or whether Congress considered it through studied analysis."[8] Rothe also claims such discovery is warranted to determine: "1) why

---

[7]Rothe seeks leave to depose a representative of the DoD and the Department of the Air Force. Rothe seeks that the DoD and DoAF representatives also produce documents responsive to 178 requests for production. Rothe also seeks leave to re-depose a representative of the Department of Commerce, but states that if this court excludes the Urban Institute report as stale, it "would no longer have a need to depose Commerce or the SBA." Docket 261 at p. 5.

[8]Motion for Clarification (docket 261) at p.2.

9

the documents, statistics and data upon which Defendants rely are still viable today and not stale and outdated; 2) the manner of how the program applies in order to direct it to only those who have suffered the specifically identified discrimination, and, by example, how DoD interprets those requirements; 3) what can be accomplished to end the alleged discrimination throughout the nation by imposing a race-based preference in DoD, NASA and the Coast Guard, agencies where it has not been shown that there is any specific discrimination, and, as applies to Defendants, there is specific evidence that there has been no evidence of discrimination in DoD; 4) what discrimination existed or exists upon which a race-based statute could be justified; 5) what it is that Defendants claim Congress relied upon for reauthorization of Section 1207 in 1999, 2002 and 2006 and the rationale for those reauthorizations; 6) whether the statute is narrowly tailored and requests for specific examples of narrow tailoring; 7) what contact Defendants had with the United States Commission on Civil Rights and the National Academy of Sciences/National Research Council. Two federal agencies that have evaluated discrimination vis-a-vis United States business practices; 8) documents which will show the reliability of any statistics collected in the past to support race-based programs; 9) the basis/foundation of documents used by the Court in its decision in ... [Rothe IV], to support its decision that Section 1207 was constitutional; and 10) the basis/foundation of documents claimed to support the constitutionality of Section 1207 by Defendants in their first Request for Protective Order, Docket #230."[9]

### Defendants' Response to Docket 261

Defendants complain that Rothe has already received all documents it needs that are necessary for a facial challenge to the statute. Defendants further complain that the discovery

---

[9]Docket 261 at p. 12.

10

requests are overly broad and not relevant. For example, Rothe seeks documents used to create the Federal Acquisition Regulations, documents regarding the SBA's section 8(a) program, and all documents showing enforcement of Title VII by defendants. Defendants also assert that the requested discovery is not needed to challenge the narrow tailoring requirement.

### Defendants' motion for protective order (docket no. 273)

Based on their arguments that Rothe's discovery requests are not relevant, burdensome and outside the scope of this court's previous discovery orders, Defendants request that this court quash the deposition subpoenas and the accompanying duces tecum.

### Department of Commerce and the Small Business Administration (docket no. 275)

The Commerce Department asserts that its representative was previously deposed in 1998, and that the Commerce Department has submitted an affidavit indicating no changes to that previous testimony was required. It further asserts that it has not had any contact with the Urban Institute regarding its study or benchmarks since that time. The SBA asserts that its representative was previously deposed in 1999, and that the SBA has submitted an affidavit indicating no changes to that previous testimony was required. It further asserts that it has not had any contact with the Urban Institute regarding its study or benchmarks since that time. Both agencies also assert that the duces tecum requests directed to them are overly broad and burdensome.

### Rothe's motion to compel DoJ (docket no. 277)

Rothe seeks leave to depose a representative of the DoJ because "DoJ authored a compilation of racial disparity studies regarding government contracting known as the Appendix, which Defendants ... rely on as evidence of the constitutionality of section 1207...." Rothe also seeks leave to propound 167 requests for production upon the DoJ.

11

## U.S. Commission on Civil Rights May 2006 Briefing Report

On June 16, 2006, Rothe made this court aware of a May 2006 report titled "Disparity Studies as Evidence of Discrimination in Federal Contracting." In that report the U.S. Commission on Civil Rights, an independent, bipartisan agency established by Congress, concluded that "three national studies of disparities - the Department of Justice's 1996 appendix to its guidance, the Urban Institute's meta-analysis, and the Department of Commerce's benchmark studies - are outdated and inappropriate now to serve as a basis for federal policy or agency action.[10]" The Commission further found that the "Department of Justice's guidance on affirmative action in federal contracting, including its appendix surveying research that establishes a compelling interest for race-conscious programs is now a decade old.... Requirements for narrowly tailoring race-conscious programs dictate that federal officials must justify preferences using current information, not evidence of discrimination that is now outdated.[11]" The Commission further recommended that federal "officials ... discard disparity studies conducted using data more than five years old. To justify the award of contracts, the government must use current data, not outdated results.[12]"

### June 20, 2006 Order (docket no. 279)

In this order the court directed Defendants to produce at a June 30, 2006 hearing " a list of evidence (including full citations to where the documents may be located), other than the Urban Institute Study and Appendix (and the citations therein), that they claim were before Congress." In

---

[10]U.S. Commission on Civil Rights, "Disparity Studies as Evidence of Discrimination in Federal Contracting", National Disparity Studies Finding 3 at p. 79.

[11]*Id.* at p. 81.

[12]*Id.* at p. 79.

12

addition, the court ordered the parties to be prepared to discuss the impact of the Commission on

Civil Rights May 2006 report on this case. In this order the court also quashed Rothe's subpoena

duces tecum issued to the SBA and Commerce Department.

This Court also acknowledged that both parties were now in agreement that the Benchmark

studies were not before Congress in the 2002 or 2006 reauthorization.

### Rothe's motion for partial reconsideration (docket no. 280)

In this motion Rothe seeks reconsideration of the court's order quashing the subpoenas duces

tecum issued to the SBA and Commerce Department. In addition, under seal Rothe has submitted

a listing of "topical questions" it intends to ask at these proposed depositions. Most of the questions

relate to the Urban Institute and the appendix, but again some questions appear directed to the 8(a)

SBA program.[13]

### DoJ Motion for Protective Order (docket no. 281)

In this motion DoJ complains that Rothe obtained a subpoena issued by the United States

District Court, District of Columbia directing a representative of the DoJ to appear for a deposition

and produce documents responsive to 167 requests for production. The motion further states that

Rothe filed a motion to compel attendance and production with that court on June 12, 2006. DoJ

seeks that a protective order be issued to prohibit this deposition.

### Defendants' motion for clarification (docket no. 282)

In this motion Defendants seek clarification as to the Court's June 20, 2006 order (docket no.

279). As stated above, in that order the court directed Defendants to produce "a list of evidence

(including full citations to where the documents may be located), other than the Urban Institute

---

[13]*See also* Status Conference of June 30, 2006, TR. at p.42.

Study and Appendix (and the citations therein), that they claim were before Congress" prior to the 2002 and 2006 reauthorizations. Defendants argue that "DoD and DoAF do not have custody nor control of all of the available Congressional evidence concerning Section 1207, save that evidence that the agencies themselves created, and the agencies do not maintain all Congressional evidence in the normal course of business. Therefore, the vast majority of the documents upon which the Congress relied in re-authorizing Section 1207, were not created nor maintained by the DoD or DoAF...." Defendants therefore argue that this court's order improperly obligates Defendants to produce documents not required by Fed. R. Civ. P. 34.

### Defendants' Response to the Court's Order dated June 20, 2006 (docket no. 285)

Pursuant to the Court's order dated June 20, 2006, Defendants filed an updated list of evidence[14] they allege was before Congress prior to the reauthorizations of 2002 and 2006. In this thirteen page document Defendants cite to various other statutes, Code of Federal Regulations, Federal Register publications, Congressional reports, Congressional Hearings, portions of the Congressional Record, and "other" Congressional sources. Some of this material dates back to 1970.

### Analysis

1. Rothe is entitled to know what evidence Defendants believe was before Congress prior to the 2002 and 2006 reauthorizations

The burden of proof is on Rothe to demonstrate that the program was unconstitutional; however, before this court can assess whether Rothe has met its burden of proof the court must review the government's evidentiary support to determine whether the legislative body had a "strong basis in evidence" to believe that remedial action based on race was necessary. Thus, the

---

[14]Defendants have since filed a revised list on July 10, 2006 (docket no. 287) and "updated" responses on July 11, 2006 (docket nos. 292 and 293).

14

government bears the burden to produce evidence, i.e., the burden of going forward with evidence. Rothe, however, "continues to bear the ultimate burden of persuading the court that the evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently narrowly tailored." *Rothe III*, 262 F.3d 1306, 1317 (Fed. Cir. 2001)(citations omitted). Defendants' motion for clarification (docket no. 282) arguing that this court's June 20, 2006 order improperly obligates Defendants to produce documents not required by Fed. R. Civ. P. 34 is DENIED.[15] The Court is satisfied that Defendants have now adequately identified this alleged evidence. *See* docket nos. 292 and 293.

2.    Rothe's staleness argument

Based on the U.S. Commission on Civil Rights May 2006 Briefing Report, Rothe requests that the court exclude all "stale" evidence.[16] *Bragdon v. Abbott*, 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)(some amount of deference is due to a qualified government agency presumed to have properly done its job.). Defendants argue that a high degree of deference is to be afforded to Congressional fact findings. *Turner Broadcasting System, Inc. v. F.C.C.*, 520 U.S. 180

---

[15]In any event, this court is of the opinion that these pretrial disclosures were required by Fed. R. Civ. P. 26. The Court further notes that it agrees with Rothe, in part, that it is ironic that it has taken so long for the Defendants to produce this listing when they argued to the Federal Circuit that remand of this case was necessary. Surely Defendants were aware of at least the pre-2002 evidence at the time it sought remand. That said, Rothe does confuse the actions of Congress in passing the reauthorizations with acts of the Defendants. Defendants merely are complying with Congressional directives and are not the custodians of Congressional evidence. Nevertheless, at least in this case, Defendants are the government representatives and must gather and present evidence to support the statute in question as best they can. The Court notes that they are assisted by attorneys from the Department of Justice.

[16]Indeed, Rothe argues that Congress had no evidence before it that can be relied upon because "in the context of "politically charged affirmative action programs" and "the political nature of Congress", Congress cannot be relied upon. *See* Status Conference of June 30, 2006, TR. at p.31.

(1997).

The Supreme Court in *Turner Broadcasting* stated, in part, the following:

> In reviewing the constitutionality of a statute, 'courts must accord substantial
> deference to the predictive judgments of Congress.' Our sole obligation is 'to assure
> that, in formulating its judgments, Congress has drawn reasonable inferences based
> on substantial evidence.' As noted in the first appeal, substantiality is to be measured
> in this context by a standard more deferential than we accord to judgments of an
> administrative agency. We owe Congress' findings deference in part because the
> institution 'is far better equipped than the judiciary to 'amass and evaluate the vast
> amounts of data' bearing upon' legislative questions. This principle has special
> significance in cases, like this one, involving congressional judgments concerning
> regulatory schemes of inherent complexity and assessments about the likely
> interaction of industries undergoing rapid economic and technological change.
> Though different in degree, the deference to Congress is in one respect akin to
> deference owed to administrative agencies because of their expertise. This is not the
> sum of the matter, however. We owe Congress' findings an additional measure of
> deference out of respect for its authority to exercise the legislative power. Even in the
> realm of First Amendment questions where Congress must base its conclusions upon
> substantial evidence, deference must be accorded to its findings as to the harm to be
> avoided and to the remedial measures adopted for that end, lest we infringe on
> traditional legislative authority to make predictive judgments when enacting
> nationwide regulatory policy.

*Id.* at 195 (citations omitted).

In addition, Defendants argue that during the 2002 and 2006 reauthorizations Congress relied

upon evidence that, in some instances, contains data that is more than five years old. Defendants

argue that it would be inappropriate for this court to "rewrite" the congressional record by summarily

excluding any documents at this time. Defendants also argue that "old" data is necessary to

demonstrate the "lingering effects of discrimination.[17] Defendants argue that they intend to present

any "old" evidence as merely a baseline or marker indicating the level of discrimination at a

---

[17]*See* Status Conference of June 30, 2006, TR. at p. 7.

16

particular point in time, but also intend to present current data to justify the section 1207 program.[18]

This case raises interesting questions. What constitutes "evidence before Congress" at the time of an act's passage or reauthorization? Congress does not conduct its business in the same manner as a court. Evidence is not formally received in the same manner. Is "evidence before Congress" limited to what was said and introduced at a hearing or on the floor? Is everything that is said or presented at a committee hearing or on the floor evidence? The Federal Circuit mandates that "the evidence must be proven to have been before Congress prior to enactment of the racial classification."[19]

At this stage of the proceedings the court is merely entertaining yet another discovery dispute in this case. Accordingly, the court declines to strike at this time any "stale" evidence. The court is mindful that, "in assessing the constitutionality of a statute in an equal protection context, a reviewing court should be able to consider all evidence available to Congress pre-dating the most recent reauthorization of the statute at issue." That said, in analyzing the future dispositive motions to be filed in this case, the Federal Circuit has also mandated that this court conduct a "detailed, skeptical, non-deferential analysis" as undertaken by the *Croson* Court. Further, the Federal Circuit

---

[18]*See* Status Conference of June 30, 2006, TR. at pp. 7-11.

[19]This court is concerned that Defendants' listing of evidence contains reports that, according to their title, reflect concerns affecting small businesses, women-owned businesses and veteran-owned businesses (but not minority-owned businesses). Defendants should insure that in filing (or responding to) any dispositive motion that all concerns raised by the Federal Circuit are addressed. Specifically, Defendants must establish that any statements or reports included in their listings were before Congress. Defendants should be prepared to establish that any speech or statement made outside any Congressional hearing or not on the floor was actually submitted to Congress by the time of the 2002 and 2006 reauthorizations. Further, Defendants should make a showing that any of the data presented in 2002 and 2006 was not so outdated that it fails to provide a strong basis in evidence for the reauthorizations.

17

mandated that this court "be satisfied that a 'strong basis in evidence' supports the legislature's
conclusion that discrimination persisted and remedial action was needed." This court must also "set
forth detailed findings as to the scope and content of the reports before Congress when it enacted the
challenged legislation, and set forth whatever inferences may be drawn as to whether such reports
could constitute a 'strong basis in evidence' for remedial action."

    2.    Is Rothe entitled to additional discovery?

    In light of this court's decision not to strike any evidence as stale at this time, the question
becomes what, if any, additional discovery is Rothe entitled to undertake?[20]  As indicated above,
Rothe seeks discovery from numerous agencies, but proceeds to seek discovery as they are the
Congress.  Rothe seeks to discover from these agencies whether Congress conducted a studied
analysis, the content of Congressional hearings, and whether the Appendix was considered by
Congress. Rothe does not require additional discovery to obtain answers to these questions.  Rothe
merely needs to review Defendants' listing of evidence.  Further, Rothe has previously deposed a
DoJ representative regarding the Appendix and Defendants merely intend to refer to the Appendix
as a baseline or marker for where things stood in 1996 (the year the Appendix was released).

    Rothe's request for discovery as to whether any of the data relied upon is stale also appears
directed at the incorrect parties.  This court's review of Defendants' listing indicates that these
various governmental agencies are not the authors for many of these documents.  Seeking discovery
from them as to quality and/or staleness of any underlying data would not be very fruitful.

---

[20]Rothe's attorneys argue that they should be entitled to take discovery from anyone who has
provided information to Members of Congress regarding the necessity of the section 1207 program.
In addition, Rothe argues that it should be able to take discovery from any SDB merely mentioned
in any document or speech. *See* Status Conference of June 30, 2006, TR. at pp. 17-19.

Rothe's concerns about seeking discovery as to efficacy of race-neutral alternatives[21], however, are more challenging. Any evidence before Congress in 2002 and 2006 must show that the section 1207 program was designed to address a remedial need and enacted in response to systematic discrimination against certain minorities. Accordingly, it appears that Rothe is entitled to engage in further limited discovery from the DoD and DoAF as to whether there still exists a compelling need for the section 1207 program and whether the section 1207 program is still narrowly tailored.

Rothe's motion for clarification (docket no. 261) is DENIED. Defendants' motion for protective order (docket no. 273) is GRANTED. Rothe's motion to compel (docket no. 277) is DENIED. Rothe's motion for reconsideration (docket no. 280) is DENIED. DOJ's motion for protective order (docket no. 281) is GRANTED.

Rothe, however, is GRANTED leave to engage in the following discovery:

If not already done, Rothe may re-depose a representative of the Urban Institute regarding its report titled "Do Minority-Owned Business Get a Fair Share of Government Contracts?" Rothe may also seek discovery from the Urban Institute as to what, if any, documents it sent to Congress as part of the 2002 and 2006 reauthorization process. Further, Rothe may seek discovery as to whether any of the Urban Institute documents sent contained stale data.

Rothe may engage in further limited discovery from the DoD and DoAF as to whether there still exists a compelling need for the section 1207 program. Rothe may also engage in further limited discovery from the DoD and DoAF as to whether the section 1207 program is still narrowly tailored. Rothe is admonished that the court will not look favorably upon its continued practice of sending

---

[21]Indeed, Rothe asserts that there is no evidence of any discrimination in DoD contracting.

19

167 requests for production involving other statutes and activities. Any depositions and requests for

production will be strictly limited to the section 1207 program.

Rothe may also propound to the DoD and DoAF the following requests for production[22]:

1.    All documents relating to your calculations of the number of contracts or the amount

      of dollars awarded to firms owned by members of each group considered socially

      disadvantaged as defined in 13 C.F.R. Part 124 in any of the last ten years.

2.    All documents produced to or for Congress or any other entity as required pursuant

      to 10 U.S.C. § 2323 for the past 10 years, which have not been previously produced

      in this case.

3.    All data showing contract dollars awarded to each designated minority for the years

      1998 to the present.

4.    All documents that show the dollars awarded to small disadvantaged businesses that

      performed as sub-contractors for the years 1998 to the present.

5.    All documents showing the data on the number and percentage of contracts going to

      small disadvantaged businesses as a whole, and minority- and non-minority-owned

      firms as a subset, by race, and the dollar value of those contracts for each fiscal year

      for the past 10 years.

6.    All documents that show the amount of contracting dollars, both prime contracts and

      subcontracts, that go to SDBs and small businesses that are non-minorities.

7.    All documents relied upon, reviewed by, examined by or used by the DoD or DoAF

      in preparing their witnesses for deposition.

---

[22]These seven requests were the only requests for production not objected to by Defendants.

## SCHEDULING ORDER

The parties shall complete all discovery on or before October 2, 2006. Counsel may not by agreement continue discovery beyond this deadline.

All dispositive motions shall be filed no later than November 6, 2006. Leave of court is granted to file a dispositive motion not to exceed 50 pages in length. Response briefs shall not exceed 25 pages in length. Citations to any appendix or exhibit should be specific. Counsel are encouraged to use exhibit tabs and bate-stamp documents for easy reference.

## CONCLUSION

For the reasons stated above, Rothe's motion for clarification (docket no. 261) is DENIED. Defendants' motion for protective order (docket no. 273) is GRANTED. Rothe's motion to compel (docket no. 277) is DENIED. Rothe's motion for reconsideration (docket no. 280) is DENIED. DOJ's motion for protective order (docket no. 281) is GRANTED. Defendant's motion for reconsideration (docket no. 282) is DENIED. Rothe is granted leave to engage in limited discovery from the DoD and DoAF as stated above.

SIGNED this 24th day of July, 2006.



XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion and the attached proposed

Order were served on July 27, 2006, by first-class mail postage prepaid, addressed to

plaintiff's counsel:

DAVID F. BARTON, Esq.
THE GARDNER LAW FIRM, P.C.
745 EAST MULBERRY AVE., SUITE 100
SAN ANTONIO, TEXAS 78212-3167

/s/ *Daniel F. Van Horn*
DANIEL F. VAN HORN
D.C. Bar No. 924092
ASSISTANT UNITED STATES ATTORNEY
CIVIL DIVISION, ROOM E-4816
555 FOURTH ST., N.W.
WASHINGTON, D.C. 20530
(202) 514-7168
daniel.vanhorn@usdoj.gov